ace

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **DAVID L. BELL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 06-4026-JAR** |
| ) | |
| **CITY OF TOPEKA, KANSAS,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff David L. Bell brings this action against the City of Topeka[1] alleging

unreasonable use of force, negligent training, and negligent supervision resulting from plaintiff's

arrest in March 2004.  This matter comes before the Court on defendant's Motion for Summary

Judgment (Doc. 85).  For the reasons set forth below, the Court grants defendant's motion and

dismisses this action.

## I.      Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[1]The City of Topeka is the only remaining defendant in this action.  On February 27, 2007, this Court dismissed defendants, former Mayor Butch Felker, former Mayor James A. McClinton, and Chief of the City of Topeka Police Department Ed E. Klumpp, who had been sued only in their official capacities, because claims against these defendants in their official capacities are redundant when the City of Topeka has been named as a defendant as well (Doc. 82).  Plaintiff has also named "Four Unknown Narcotics Agents of the City of Topeka Police Department" as defendants.  However, plaintiff did not amend the Complaint to name these "unknown" officers before the statute of limitations expired.  On July 12, 2006, the Honorable K. Gary Sebelius, United States Magistrate Judge, denied plaintiff's untimely attempt to amend the Complaint as the proposed amendment did not relate back to the original Complaint under Fed. R. Civ. P. 15(c)(3)(B).  (Doc. 33); *see also Garrett v. Fleming*, 362 F.3d 692, 696 (10th Cir. 2004).  Plaintiff objected to this ruling, and on September 21, 2006, this Court affirmed Judge Sebelius's Order.  (Doc. 46.)

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[2]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[3]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[4]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[5]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[6]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[7]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[8]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[10]

---

[2]Fed. R. Civ. P. 56(c).

[3]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4]*Id.*

[5]*Id.* at 251–52.

[6]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[7]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[8]*Id.*

[9]*Id.*

[10]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

## II.     Factual Background

### A.     Evidentiary Issues

Defendant argues that several documents filed in support of plaintiff's summary

judgment response are not properly authenticated and are therefore inadmissible.

> Unauthenticated documents, once challenged, cannot be
> considered by a court in determining a summary judgment motion.
> In order for documents not yet part of the court record to be
> considered by a court in support of or in opposition to a summary
> judgment motion they must meet a two-prong test: (1) the
> document must be attached to and authenticated by an affidavit
> which conforms to rule 56(e); and (2) the affiant must be a
> competent witness through whom the document can be received
> into evidence . . . . Documentary evidence for which a proper
> foundation has not been laid cannot support a summary judgment
> motion, even if the documents in question are highly probative of a
> central and essential issue in the case.[11]

Specifically, defendant objects to a collection of documents attached to plaintiff's

summary judgment response as Exhibit C.[12]  That exhibit begins with an affidavit from

plaintiff's counsel in which he states that the following documents are true and accurate copies

of the deposition of Chief of Police Edwin E. Klumpp and exhibits that were used in that

deposition.  Plaintiff attempts to controvert several of defendant's Statements of Uncontroverted

Facts by citing certain exhibits that were used in Chief Klumpp's deposition, but the Court

agrees with defendant that these documents do not appear to be properly authenticated.[13]  A party

---

[11]*In re Harris*, 209 B.R. 990, 996 (B.A.P. 10th Cir. 1997) (quoting 11 James Wm. Moore, et al., Moore's Federal Practice §§ 56.10[4][c][i], 56.14[2][c] (3d ed. 1997)); *see also Toney v. Cuomo*, 92 F. Supp. 2d 1186, 1196 (D. Kan. 2000), *aff'd*, 221 F.3d 1353 (10th Cir. 2000).

[12]There are ten, separate documents attached as Exhibit C.  (Doc. 100, Exs. C-3, C-5, C-7, C-9, C-12, C-13, C-14, C-15, C-17, and C-18.)

[13]Specifically, defendant objects to Exhibits C-9, C-12, C-13, C-14, C-15, C-17, and C-18 as not properly authenticated.  (Doc. 103 at 4.)

3

may properly authenticate a document "through a supporting affidavit or deposition excerpt from anyone with personal knowledge of the facts contained in the exhibit."[14]  The personal affidavit submitted by plaintiff's counsel is insufficient to provide authentication when plaintiff's counsel is not the author of these documents nor does he state that he has any personal knowledge of the facts contained within those documents.[15]  Also, the deposition of Chief Klumpp fails to authenticate these exhibits when there is no citation to a relevant portion of that deposition showing that Chief Klumpp has personal knowledge of the facts contained within the exhibits. Because plaintiff does not set forth the proper authentication for these deposition exhibits, the Court may not consider these documents.[16]

Additionally, the Court disregards these documents as immaterial.  Plaintiff points to these documents to support his allegations of corruption within the Topeka Police Department ("TPD") Narcotics Unit.  However, plaintiff fails to provide any evidence showing that this alleged corruption is relevant to his claim of excessive force during his arrest in March 2004. Indeed, Chief Klumpp testified that Exhibits 9, 17, and 18,[17] which are various communications and reports regarding an investigation of the TPD Narcotics Unit, had nothing to do with the use of excessive force by any police officer.

**B.    Uncontroverted Facts**

The following facts are either uncontroverted, stipulated to, or viewed in the light most

---

[14]*Toney*, 92 F. Supp. 2d at 1196.

[15]*See* Fed. R. Civ. P. 56(e) ( stating that "[s]upporting and opposing affidavits shall be made on personal knowledge . . . .").

[16]Nor do these exhibits qualify as "self-authenticated" public records under Fed. R. Evid. 902(4) because they are not "certified as correct by the custodian or other person authorized to make the certification . . . ."

[17](Doc. 100, Exs. C-9, C-17, C-18.)

favorable to plaintiff.  Late in the evening of March 3, 2004, and continuing to the early morning hours of March 4, 2004, TPD Sergeant Ron Erwin was in charge of the execution of a search warrant, that had been signed by a judge, at a residence on Swygart Street.  The target of the search warrant was Anuerin Netherland.  At or around 11:50 p.m. on March 3, 2004, plaintiff and his girlfriend drove to Netherland's residence on Swygart, arriving at approximately 11:55 p.m. or 11:57 p.m.  Plaintiff's girlfriend went into the residence while plaintiff waited in the car.  After a few minutes, plaintiff hit the horn twice to tell his girlfriend to "come on."

Somewhere between 11:55 p.m. and 11:58 p.m., TPD officers arrived at the Swygart residence.  The TPD officers were dressed in uniforms with "POLICE" written in big, black letters on the back.  Lieutenant Frank Pase, the highest ranking officer in the TPD Narcotics Unit at the time of the execution of the search warrant, was present at the scene to provide perimeter control and to supervise officers.[18]  As the TPD officers approached the house alongside plaintiff's car, the horn in plaintiff's car honked.  Lieutenant Pase testified that the honking of the horn posed an officer safety issue.  Lieutenant Pase then heard TPD officers ordering the person in the car to show his hands and to get out of the car.  One of the TPD officers pointed his rifle toward the passenger area of the car, and then broke out the passenger side window of the vehicle.  Afterwards, someone opened the door on the driver's side, grabbed plaintiff's left arm, and started yanking it.  Someone told plaintiff to "get out of the car," but plaintiff was unable to

---

[18]Plaintiff attempts to controvert this fact by citing the testimony of Officer Kristoffer Souma, who did not recall whether Lieutenant Pase was present at the scene that evening, and Lieutenant Pase's time sheets for the morning of March 4, 2004, attached as Exhibit E to plaintiff's response.  Exhibit E contains the TPD's Operation Plan for executing the search warrant on the Swygart residence, but it does not contain Lieutenant Pase's time sheets.  (Doc. 100, Exhibit E.)  In its reply, defendant properly attached Lieutenant Pase's time sheets that show that Lieutenant Pase worked from midnight to 2:30 a.m. on March 4, 2004.  (Doc. 103, Exs. 17, 18.)  Moreover, Lieutenant Pase testified that he was in fact at the scene that evening.

get out of the car because his seatbelt was still fastened.  Officer Kristoffer Souma used the flashlight on his weapon to illuminate the interior of the vehicle, while Officer Bruce Voigt started to remove plaintiff from the car and Officer Doug Garman came to assist.  Plaintiff reached down to the right to release his seatbelt.  He hit the release button on his seatbelt, and he was jerked from the car.  Plaintiff claims that after he was pulled from the car, officers slapped hand cuffs on him and slammed him face-first into the car, causing plaintiff to suffer a dental injury.  Afterwards, plaintiff was beaten on his legs and lower back, and then he fell to the ground on his knees.  Officers then picked plaintiff up, carried him a couple of steps, and then dropped him back down, forcing him to lie face down in a puddle of water.  Lieutenant Pase saw the officers remove plaintiff from the car, but he did not see plaintiff being taken to the ground because he could only glance over occasionally while tending to his duties.  Lieutenant Pase also saw the officers bring plaintiff toward the street where he lay face down on the ground.

Sergeant Erwin stayed with plaintiff while the officers proceeded with the execution of the search warrant.  Plaintiff contends that he asked Sergeant Erwin if he could move so that he would not have to be face down in the water, and Sergeant Erwin's response was, "Shut the fuck up right now before I put my foot on the back of your motherfucking neck and hold you face down in that water until you drown."  After that, plaintiff claims that Sergeant Erwin made comments such as "I ought to shoot you."  After the scene was secured and officer safety was under control, Lieutenant Pase told Sergeant Erwin to pick plaintiff up off of the ground.  At that point, officers wanted to search plaintiff, who told them, "the only thing lower than a motherfucking crackhead was the motherfucking Topeka Police Department."  He also told an officer, "Kiss my ass and good luck."  The officers then told plaintiff that they needed to search

his car, and they warned him if they cut themselves on the broken glass from his crack pipe that

he would be in trouble.  Plaintiff laughed and told the officers, "You stupid motherfuckers, you

broke the glass—broke the windows of my car.  There's—the car is full of glass."  Throughout

the events that evening and in the early morning, plaintiff describes the officers as being dressed

in black, "ninja-like clothing" and wearing masks.  Plaintiff was then put into a car for transport

to the jail.  Plaintiff asked the officer who was transporting him to loosen the handcuffs, which

the officer did.  Plaintiff was at the jail for approximately twenty-six minutes before he was

released at about 1:26 a.m.

On the evening of the raid, Lieutenant Pase did not see any officer hit or threaten

plaintiff.  If he had seen an officer mistreat plaintiff, Lieutenant Pase would have disciplined that

officer.  TPD General Order O04, titled "Use of Force (Lethal & Non Lethal)," states:

> It is the policy of this Department that police officers acting in a
> law enforcement capacity will use only the amount of force
> necessary to bring an incident under control effectively, while
> protecting the lives of the officer and others.  Any application of
> force by an officer of this department shall be lawful, necessary
> and objectively reasonable.

TPD officers are subject to discipline for use of excessive force.  Also, unreasonable or abusive

treatment of a citizen is grounds for suspension or termination from the TPD.  When executing

search warrants, it is the policy of the TPD that its officers will comply with Kansas state law.

Plaintiff complains that he was unable to file a complaint against the officers involved in

his arrest on March 4, 2004, because the TPD lacks an effective complaint procedure.  However,

Chief Klumpp and Lieutenant Pase specifically testified that the TPD has a procedure in place

for taking both internal complaints and citizen complaints.  Yet plaintiff objects that these

procedures did not require "mandatory reporting."  Plaintiff also states that he attempted to

locate similar instances of excessive force claims by placing an advertisement the newspaper; however, plaintiff was unsuccessful in this attempt.

Kansas law requires that all police recruits complete at least 320 hours of law enforcement training before being certified as a law enforcement officer.[19]  All officers must complete at least 40 hours of continuing law enforcement education annually after becoming certified as a law enforcement officer.[20]  During basic training, TPD officers learn about state and federal laws, constitutional rights, civil rights, arrest procedures, handcuffing, use of force, TPD General Orders, and TPD Standard Operating Procedures.  Whenever TPD General Orders or TPD Standard Operating Procedures are changed, all officers receive a copy of the updated policy.  Supervisors are also available to answer questions regarding policy changes.  In continuing law enforcement education classes, officers receive training by lawyers on legal matters such as constitutional law and civil rights.  Additionally, members of the TPD Narcotics Unit have attended several training sessions with personnel from the District Attorney's Office and the federal prosecutor's office.  Supervisors also have conducted monthly training sessions for the TPD Narcotics Unit, and the TPD Narcotics Unit has received "room entry" training from outside training schools and the TPD Response Team, which was responsible for "high risk entries."  During their training, TPD officers are taught to use the minimum force necessary to execute an arrest.

Lieutenant Pase completed basic law enforcement training on March 19, 1982, after completing 415 hours of classroom training.  The 1982 TPD Basic Law Enforcement Training

---

[19]K.S.A. § 74-5607a.

[20]*Id.*

Curriculum, completed by Lieutenant Pase, included courses on the United States Constitution and the Bill of Rights, the Kansas Criminal Code and Procedure, search and seizure, the law of arrest, civil and criminal liability, abuse of force, narcotics and dangerous drugs, code of ethics, police discretion, prejudice and civil rights, and techniques of arrest.  Lieutenant Pase completed 215.25 hours of continuing law enforcement education between July 2002 and June 2003, and 175 hours of continuing law enforcement education between July 2003 and June 2004.  Prior to March 3, 2004, Lieutenant Pase completed at least 164 hours of supervisor training courses, including 35.5 hours of Drug Enforcement Agency ("DEA") Narcotics Supervisor Leadership Training.  Between June 2002 and March 2004, Lieutenant Pase completed 93 hours of TPD Narcotics Unit or Response Team training.  Lieutenant Pase also completed an eight-hour Constitutional Law course taught by the Kansas Bureau of Investigation on May 26, 1995.  Additionally, on September 24, 2002, Lieutenant Pase completed a 32-hour continuing law enforcement education course entitled High Risk Entry and Tactical Pistol School.

Sergeant Erwin completed basic law enforcement training on March 18, 1983, after completing 430 hours of classroom training.  The 1983 TPD Basic Law Enforcement Training Curriculum, completed by Sergeant Erwin, included courses on the United States Constitution and the Bill of Rights, the Kansas Criminal Code and Procedure, search and seizure, the law of arrest, civil and criminal liability, abuse of force, mechanics of arrest, narcotics and dangerous drugs, police professionalism, and prejudice and civil rights.  Sergeant Erwin completed 148 hours of continuing law enforcement education between July 2002 and June 2003, and 80.50 hours of continuing law enforcement education between July 2003 and June 2004.  Prior to March 3, 2004, Sergeant Erwin completed at least 57 hours of supervisory training courses.

9

Between January 2001 and March 2004, Sergeant Erwin completed at least 71 hours of TPD

Narcotics Unit Training or Response Team Training.  And between September 1999 and

September 2002, Sergeant Erwin completed at least 200 hours of additional training related to

narcotics, including 16 hours of training on Tactical Raid Entry for Drug Warrants, 32 hours of

Kansas Narcotic Officers Association training, 40 hours of DEA training for clandestine lab

certification, and 80 hours of DEA basic drug law enforcement training.  Also, on September 24,

2002, Sergeant Erwin completed a 32-hour continuing law enforcement education course entitled

High Risk Entry and Tactical Pistol School.

      Officer Voigt finished basic law enforcement training on March 13, 1987, after

completing 398 hours of classroom training.  The 1987 TPD Basic Law Enforcement Training

Curriculum, completed by Officer Voigt, included courses on the United States Constitution and

the Bill of Rights, the Kansas Criminal Code and Procedure, search and seizure, the law of

arrest, civil and criminal liability, abuse of force, mechanics of arrest, narcotics and dangerous

drugs, police professionalism, and prejudice and civil rights.  Officer Voigt completed 104 hours

of continuing law enforcement education between July 2002 and June 2003, and 100.50 hours of

continuing law enforcement education between July 2003 and June 2004.  Between January

2001 and March 2004, Officer Voigt completed at least 63 hours of TPD Narcotics Unit Training

or Response Team Training.  And between December 1995 and September 2002, Officer Voigt

completed at least 162 additional hours of continuing education related to narcotics, including 27

hours in which he served as the instructor.  Also, on September 24, 2002, Officer Voigt

completed a 32-hour continuing law enforcement education course entitled High Risk Entry and

Tactical Pistol School.

Officer Souma finished basic law enforcement training on August 26, 1994, after completing 478 hours of classroom training.  The 1994 TPD Basic Law Enforcement Training Curriculum, completed by Officer Souma, included courses on the mechanics of arrest, the United States Constitution and the Bill of Rights, the Kansas Criminal Code and Procedure, search and seizure, the law of arrest, civil and criminal liability, abuse of force, narcotics and dangerous drugs, police professionalism, and prejudice and civil rights.  Officer Souma completed 80 hours of continuing law enforcement education between July 2002 and June 2003, and 100.50 hours of continuing law enforcement education between July 2003 and June 2004.  Between December 2002 and January 2004, Officer Souma completed at least 39 hours of TPD Narcotics Unit Training or Response Team Training.  Additionally, on September 24, 2002, Officer Souma completed a 32-hour continuing law enforcement education course entitled High Risk Entry and Tactical Pistol School.

Officer Garman finished basic law enforcement training on June 28, 1996, after completing 320 hours of classroom training.  In April 2000, after joining the TPD, Officer Garman completed an additional 120 hours of extended basic training.  The Kansas Law Enforcement Training Center, Hutchinson, Kansas, Basic Law Enforcement Course Curriculum for 1995, that was completed by Officer Garman, included courses on the United States Constitution and the Bill of Rights, the Kansas Criminal Code and Procedure, the law of arrest, search and seizure, civil and criminal liability, abuse of force, mechanics of arrest, handcuffing and search techniques, narcotics and dangerous drugs, and police ethics.  Officer Garman completed 120 hours of continuing law enforcement education between July 2002 and June 2003, and 84 hours of continuing law enforcement education between July 2003 and June 2004.

11

Between July 2001 and January 2004, Officer Garman completed at least 79 hours of TPD Narcotics Unit Training or Response Team Training.  Officer Garman also completed 28 college credit hours in Criminal Justice.  Additionally, on September 24, 2002, Officer Garman completed a 32-hour continuing law enforcement education course entitled High Risk Entry and Tactical Pistol School.

Chief Klumpp was the Chief of Police for the City of Topeka in March 2004.  The Chief of Police is responsible for establishing policy for the TPD.  Chief Klumpp had no knowledge that Lieutenant Pase, Sergeant Erwin, Officer Voigt, Officer Souma, or Officer Garman used excessive force against any citizen during any narcotics raid.  Chief Klumpp also had no reason to believe that there was any undue risk of harm to others that would result from employing any of these individuals as TPD officers.

## III.   Analysis

In this action, plaintiff brings a claim under 42 U.S.C. § 1983 against defendant asserting three theories of recovery—excessive use of force, negligent training, and negligent supervision.[21]  Each theory is discussed below in turn.

### A.   Excessive Use of Force

Defendant City of Topeka, as a municipal agency, can be sued directly under 42 § U.S.C.

---

[21]These are the only theories of recovery listed in the Pretrial Order (Doc. 84 at 10–15).  The Pretrial Order "'measures the dimensions of the lawsuit,' and 'control[s] the subsequent course of the action unless modified by a subsequent order.'" *Shaub v. Newton Wall Co/UCAC*, 153 Fed. App'x 461, 464 (10th Cir. 2005) (quoting *Hullman v. Bd. of Trustees of Pratt Cmty. Coll.*, 950 F.2d 665, 668 (10th Cir. 1991); Fed. R. Civ. P. 16(e)).  In his Complaint, plaintiff also alleged claims of due process violations under the Fifth and Fourteenth Amendments and conspiracy under 42 U.S.C. § 1985 (Doc. 1 at 17, 21).  Defendant points out in its motion for summary judgment that these claims were not included in the Pretrial Order, but nevertheless argues that defendant is entitled to summary judgment on such claims.  Plaintiff does not address these additional claims in his response.  Because such claims were not included in the Pretrial Order, the Court concludes that plaintiff has abandoned these additional claims and will not address such claims in considering defendant's summary judgment motion.

1983 for monetary, declaratory, or injunctive relief.[22]  However, a municipality cannot be held

liable for the actions of an employee solely on a respondeat superior theory.[23]  "Rather, to

establish municipal liability, a plaintiff must show (1) the existence of a municipal policy or

custom, and (2) that there is a direct causal link between the policy or custom and the injury

alleged."[24]  An injury results from a municipal "policy" if it results "from the decisions of its

duly constituted legislative body or of those officials whose acts may fairly be said to be those of

the municipality."[25]  "Similarly, an act performed pursuant to a 'custom' that has not been

formally approved by an appropriate decisionmaker may fairly subject a municipality to liability

on the theory that the relevant practice is so widespread as to have the force of law."[26]

        There is no evidence in the record that defendant City of Topeka has a policy or custom

of condoning the use of excessive force.[27]  Plaintiff states as much when he admits that he does

not have evidence of other incidents of excessive force, similar to his allegations.  Plaintiff states

that he advertised in the newspaper, but he was unsuccessful at locating any persons with

excessive force complaints against the TPD.  Plaintiff then argues that the reason that he was

unsuccessful is that

---

[22]*Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978).

[23]*Id.* at 691.

[24]*Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

[25]*Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403–404 (1997) (citing *Monell*, 436 U.S. at 694).

[26]*Id.* at 404 (citing *Monell*, 436 U.S. at 690–91).

[27]To the extent plaintiff alleges such in the Pretrial Order (Doc. 84 at 10), plaintiff has also not shown that the TPD has a policy or custom of condoning unreasonable searches and seizures or false imprisonment or arrest.

> the narcotics officers who are abusive of citizens are generally
> treating malcontents and disenfranchised individuals who have no
> ability to either confront the police to file a complaint for
> excessive force or wish to do so since (many [sic] of these
> individuals are either incarcerated, are without meaningful
> occupation or would maintain a lifestyle that would permit either
> notification to them (subscribe to the local newspaper), or their
> willing participation in confronting abusive treatment or bullying
> by narcotics officers.[28]

To be sure, narcotics officers may encounter people with criminal records, or people engaged in criminal activity, who for these or other reasons may refrain from complaining about any abusive police conduct.  Yet, plaintiff's statements are speculative and provide no evidence that there have been other incidents of excessive force within the TPD to show a widespread practice of unconstitutional conduct.

Plaintiff also argues that the TPD lacks a "proactive" citizen complaint procedure.  While not entirely clear, the Court will construe plaintiff's argument as asserting that an inadequate complaint procedure shows that other incidents of excessive force have occurred, yet have gone unreported.  But there is no evidence that such is the case.  Further, there is no evidence that the TPD's complaint procedure is inadequate.  Chief Klumpp and Lieutenant Pase testified that the TPD has a procedure in place for taking both internal complaints and citizen complaints, and they described how that procedure operates in practice.  Plaintiff complains that the complaint procedure does not require "mandatory reporting."  It is unclear whether plaintiff is alleging that there is no mandatory reporting by citizens, or no mandatory reporting by police of complaints taken from citizens.  In any event, plaintiff does not show how TPD's complaint procedure insufficient.  Plaintiff also contends that two newspaper articles show that the TPD does not

---

[28](Doc. 100 at 23–24.)

14

provide "proactive citizen complaint procedures."  The first article, "And the survey says: Police

seek feedback," is dated April 14, 1999, almost five years before plaintiff's arrest occurred in

March 2004, causing the Court to question the relevance of this article when it is so removed in

time from the allegations giving rise to plaintiff's claims.  Further, this article does not state that

the TPD has an insufficient complaint procedure, but rather the article describes the TPD's

implementation of citizen surveys so that the TPD may gather performance feedback from

citizens, not facilitate complaints.  The second article, dated February 16, 2007, almost three

years after plaintiff's arrest occurred in March 2004, discusses a "law enforcement partnership

panel" formed by the Topeka branch of the NAACP and the City of Topeka that will provide

opinions to the TPD regarding police procedures such as recruiting, cultural competency, and the

process of filing citizen complaints.  This article does not state that the TPD lacks a "proactive

citizen complaint procedure," but merely describes the formation of this panel to provide

opinions to the TPD regarding the complaint process.  Both of these articles lack any discussion

of excessive force complaints, and therefore this evidence does not show that the TPD had a

policy or custom condoning the use of excessive force by police officers.

While plaintiff cannot show that defendant City of Topeka has a policy or custom of

condoning the use of excessive force, there is evidence in the record proving the opposite—the

TPD has an express policy prohibiting use of excessive force by police officers. TPD General

Order O04 requires that police officers use only the amount of force necessary to bring an

incident under control effectively, while protecting the lives of the officer and others.  This

policy further mandates that any application of force by an officer must be lawful, necessary, and

objectively reasonable.  If a TPD officer uses excessive force, that officer is subject to discipline.

Further, unreasonable or abusive treatment of a citizen is grounds for suspension or termination from the TPD.  Based on the uncontroverted evidence, plaintiff has not shown that the TPD has a policy or custom that condones the use of excessive force by police officers.

Plaintiff also cannot show that he suffered a constitutional deprivation based on the actions of any policy maker for the City of Topeka.  "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and . . . whether an official had final policymaking authority is a question of state law."[29]  It is uncontroverted that in March 2004, Chief Klumpp, as the Chief of Police for the City of Topeka, was responsible for establishing policy for the TPD.[30]  There is no evidence that Chief Klumpp was personally involved with plaintiff's arrest in March of 2004, or that he condoned the use of excessive force on plaintiff by any TPD officer.  Instead, Chief Klumpp testified that he had no knowledge that Lieutenant Pase, Sergeant Erwin, Officer Voigt, Officer Souma, or Officer Garman used excessive force against any citizen during any narcotics raid and that Chief Klumpp had no reason to believe that there was any undue risk of harm to others that would result from employing any of these individuals as TPD officers.  Because plaintiff cannot show that any policymaker violated his constitutional rights, the Court grants summary judgment in favor of defendant on plaintiff's municipal liability claim for use of excessive force.

**B.     Negligent Training**

"In the absence of an explicit policy or an entrenched custom, 'the inadequacy of police training may serve as a basis of § 1983 liability . . . where the failure to train amounts to a

---

[29]*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

[30]Plaintiff does not allege nor is there evidence in the record to conclude that Lieutenant Pase, Sergeant Erwin, Officer Voigt, Officer Souma, or Officer Garman were policymakers for the TPD or the City of Topeka.

deliberate indifference to the rights of persons with whom the police come into contact.'"[31]  The "well established" elements of a claim under § 1983 for inadequate training of police officers in the use of force require a plaintiff to show: "(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training."[32]  Defendant argues that plaintiff's claim must fail because, even assuming that he can establish the first and second elements, plaintiff cannot provide evidence to support the third and fourth elements under this standard.  The Court agrees.

As to the third element, there is no evidence that inadequate training demonstrates deliberate indifference on the part of the City of Topeka.  To find deliberate indifference, a plaintiff must show that "'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need.'"[33]  Plaintiff argues that the "state of affairs" within the TPD Narcotics Unit presents a genuine issue of fact as to whether or not Chief Klumpp knew or should have known of officer misconduct.[34]  Plaintiff

---

[31]*Newell v. City of Salina*, 276 F. Supp. 2d 1148, 1156 (D. Kan. 2003) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

[32]*Id.* (quoting *Allen v. Muskogee*, 119 F.3d 837, 841–42 (10th Cir. 1997)).

[33]*Brown v. Gray*, 227 F.3d 1278, 1288 (10th Cir. 2000) (quoting *City of Canton*, 489 U.S. at 390).

[34]To the extent plaintiff is relying on allegations of corruption within the TPD Narcotics Unit, as explained above, plaintiff has failed to submit authenticated evidence of such allegations.  Even if the Court were to consider such evidence, these allegations fail to provide evidence of deliberate indifference on the part of Chief Klumpp to support plaintiff's claim for excessive force.  As explained above, the allegations and investigations of corruption in

17

cites *Bordanaro v. McLeod*,[35] in which the First Circuit found that a police chief should have known that a police department had a "longstanding, wide-spread, and facially unconstitutional practice of breaking down doors without a warrant when arresting a felon," and that allowing this practice to continue amounted to deliberate indifference.[36]  But unlike the facts in *Bordanaro*, plaintiff cannot point to any "longstanding, wide-spread" practice of TPD officers using excessive force.  In fact, as described above, plaintiff admits that he was unable to find any other individual with an excessive force claim against the TPD.  Plaintiff also appears to take issue with the use of a "no-knock" warrant which plaintiff describes as a "dangerous activity."  Plaintiff makes the conclusory allegation that this was a situation in which "abuses are likely to occur," but fails to explain how the use of a no-knock warrant relates to his claims of excessive force.

In any event, the evidence shows that the officers involved in plaintiff's arrest in March 2004, were adequately trained in search and seizure and arrest techniques.  Each of the officers received more than the amount of basic law enforcement training required by Kansas law, and that training included courses on search and seizure, arrest techniques, and use of force.  Additionally, all of the officers completed the annual 40-hour continuing law enforcement education requirement by attending various courses, including training related to narcotics.  Plaintiff does not allege that this training was "inadequate as compared to any recognized or

---

the TPD Narcotics Unit are completely unrelated to plaintiff's claims of excessive force occurring in March 2004. As defendant points out, plaintiff "offers no argument how allegations against a TPD officer for stealing drug buy money or any other alleged crime constitutes **unconstitutional misconduct**."  (Doc. 103 at 9) (emphasis in original). Even if the Court were to consider such evidence, it does not support a finding that Chief Klumpp knew or should have known that TPD officers had a practice of using excessive force.

[35]871 F.2d 1151 (1st Cir. 1989).

[36]*Id.* at 1156, 1162.

accepted law enforcement standards."[37]  Moreover, plaintiff has failed to provide expert testimony proffering that the TPD's training program was inadequate or that it suffered from any "glaring omission" from which "one could reasonably say that the use of excessive force against the plaintiff . . . was a highly predictable consequence of the omission."[38]  Thus, the Court concludes that plaintiff has failed to show any inadequacies in the TPD's training sufficient to demonstrate deliberate indifference.

Further, as to the fourth element, plaintiff points to no evidence in the record of a direct causal link between the constitutional deprivation and inadequate training.  "[I]n order for liability to attach in a failure to train case, 'the identified deficiency in a city's training program must be closely related to the ultimate injury,' so that it 'actually caused' the constitutional violation."[39]  Plaintiff fails to allege any deficiency in the TPD training program with respect to use of excessive force, and further plaintiff fails to explain how any alleged deficiency is "closely related" to his arrest so that it caused the alleged constitutional deprivation.  As such, plaintiff has failed to "go beyond mere allegations that officer training is deficient" to properly establish a claim for negligent training.[40]  Accordingly, the Court concludes that summary judgment in favor of defendant on this claim is appropriate.

---

[37]*Newell*, 276 F. Supp. 2d at 1158.

[38]*Id.* (explaining that "[p]laintiff proffers no witness with knowledge in law enforcement or constitutional standards to identify or explain how this incident could be viewed as a predictable result of the City's alleged lack of training its officers to differentiate between persons with panic disorder and intoxicated persons" and comparing with *Allen v. Muskogee*, 119 F.3d 837, 842–43 (10th Cir. 1997), in which "expert on police tactics and procedures testified that the city's training concerning handling of mentally ill individuals was contrary to police department training throughout the United States and that it caused the violation of plaintiff's rights").

[39]*Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir. 2000) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

[40]*Newell*, 276 F. Supp. 2d at 1158 (citing *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1998)).

### C.      Negligent Supervision[41]

The Tenth Circuit treats allegations of failure to supervise in the same manner as failure to train claims.[42]  To bring a claim under § 1983 against a municipality for negligent supervision, a plaintiff must show that a municipality's failure to supervise "evidences a deliberate indifference to the rights of its inhabitants" such that this shortcoming is "thought of as a city policy or custom."[43]  Plaintiff has not shown any deficiencies in defendant's supervision of its employees to establish deliberate indifference.  Plaintiff argues that "a minimal supervisory plan" or a "guideline to determine the official supervision" is necessary, "akin to the requirements . . . under the Americans with Disabilities Act,"[44] but the Court fails to see what this Act has to do with plaintiff's § 1983 claim or how the lack of a "supervisory plan" amounts to deliberate indifference.  Rather, the record lacks any evidence of a failure to supervise when the officers involved with plaintiff's arrest had sufficient supervisor experience and training.  On the night of plaintiff's arrest, Lieutenant Pase was the highest ranking officer in the TPD Narcotics Unit.  He was present at the scene to provide perimeter control and to supervise

---

[41]In the Pretrial Order, the parties list the elements necessary to prove negligent supervision under Kansas state law.  (Doc. 84 at 14–15.)  To the extent plaintiff has brought a claim under § 1983 and a supplemental state law claim for negligent supervision, this state law claim would fail as well.  To bring a claim for negligent supervision under Kansas law, a plaintiff must show that "the employer had reason to believe that an undue risk of harm to others would exist as a result of the employment of the alleged tort feasor" and "such harm is within the risk." *Estate of Sisk v. Manzanares*, 262 F. Supp. 2d 1162, 1187 (D. Kan. 2002).  As explained above, plaintiff has failed to provide evidence that defendant knew or should have known of a risk of harm to others due to a policy of TPD officers using excessive force, especially when plaintiff has failed to come forward with evidence of other individuals who have alleged excessive force complaints.

[42]*Whitewater v. Goss*, 192 Fed. App'x 794, 797 (10th Cir. 2006).

[43]*Id.*; *see also Specht v. Jensen*, 863 F.2d 700, 702 (10th Cir. 1988).

[44](Doc. 100 at 17.)

20

officers.  The record shows that Lieutenant Pase has completed numerous hours of supervising training, including Narcotics Supervisor Leadership Training.  Sergeant Erwin, who was in charge of the execution of the search warrant and present at the scene that night, has also completed many hours of supervisory training courses.

Further, "an isolated instance of police misconduct without more is not sufficient to raise as a fact issue whether the alleged constitutional violation was caused by the City's failure to . . . supervise, or by any other official act or omission."[45]  In this case, plaintiff has alleged an isolated incident of unreasonable use of force, and admits that he cannot find other individuals alleging similar claims against TPD officers.  Without more, plaintiff cannot show deliberate indifference on the part of the City of Topeka.  Thus, plaintiff cannot bring a claim against defendant, as a municipality, for failure to supervise.

## IV.    Conclusion

For the reasons set forth above, plaintiff has failed to raise a genuine issue of material fact as to whether defendant City of Topeka can be held liable for plaintiff's claims of unreasonable use of force, negligent training, and negligent supervision.  Therefore, the Court grants summary judgment in favor of defendant City of Topeka, and dismisses this action in its entirety.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 85) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 9[th]___ day of July 2007.

---

[45]*Cowdry v. City of Eastborough*, 730 F.2d 1376, 1379 (10th Cir. 1984) (citing *McClelland v. Facteau*, 610 F.2d 693, 697–98 (10th Cir. 1979)).

 S/ Julie A. Robinson

**Julie A. Robinson**
**United States District Judge**


Memorandum and Order Granting Defendant's Motion for Summary Judgment, *Bell v. City of Topeka, Kansas, et al.*, No. 06-4026-JAR